AMERICAN SURETY CO. OF NEW YORK v. SHALLENBERGER, Governor, et al.

(Circuit Court, D. Nebraska, Lincoln Division. November 7, 1910.)

No. 7, Docket B.

**1. STATUTES (§ 64\*)—EFFECT OF PARTIAL INVALIDITY—STATUTES RELATING TO CORPORATIONS.**

A state statute which applies to all corporations doing a certain business in the state, both foreign and domestic, if invalid as to one class of corporations is invalid as to all.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58–66, 195; Dec. Dig. § 64.\*]

**2. PRINCIPAL AND SURETY (§ 52\*)—SURETY COMPANIES—POWER TO REGULATE.**

The business of a surety company engaged in furnishing bonds, undertakings, etc., is not one affected by any public interest nor a monopoly, but is purely a private business, and a state has no power to prescribe rates to be charged by such corporations.

[Ed. Note.—For other cases, see Principal and Surety, Dec. Dig. § 52.\*]

**3. CONSTITUTIONAL LAW (§ 298\*)—DUE PROCESS OF LAW—DEPRIVATION OF LIBERTY TO CONTRACT—STATUTE FIXING CHARGES OF SURETY COMPANIES.**

Act Nebraska April 1, 1909 (Laws 1909, c. 27), which makes it the duty of certain state officers to fix maximum rates of premium to be charged by all surety companies doing business in the state, foreign or domestic, for furnishing bonds, contracts, recognizances, stipulations and undertakings, makes it a misdemeanor for any officer or agent of any company to charge a higher rate and requires the revocation of the authority of the offending company to do business in the state, is void as depriving such companies of their property without due process of law, in violation of the fourteenth constitutional amendment.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 847; Dec. Dig. § 298.\*]

In Equity. Suit by the American Surety Company of New York against Ashton C. Shallenberger, Governor, William T. Thompson,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Attorney General, and Silas R. Barton, Auditor of Public Accounts, of the State of Nebraska. Decree for complainant.

Montgomery & Hall, for complainant.
W. T. Thompson, Atty. Gen., for defendants.

T. C. MUNGER, District Judge. The Legislature of Nebraska passed an act, approved April 1, 1909 (Laws 1909, c. 27), which declared it to be the duty of certain state officers to fix the maximum rates of premiums that any fidelity or surety company transacting business in the state might charge for furnishing each and all of the different kinds of bonds, contracts, recognizances, stipulations, and undertakings. This act also makes it unlawful for any such company to charge or receive any larger rate of premium than the rates so fixed, and any agent or officer charging or receiving such premium is chargeable with a misdemeanor. The State Auditor is also commanded to revoke the authority of the offending company to transact business in the state, and it shall not be permitted to transact business within the state for a period of one year. The act of the Legislature is as follows:

"Section 1. Surety Companies—Board to Fix Rates. It shall be the duty of the Governor, Attorney General and Auditor of Public Accounts to investigate the rates of premium heretofore charged by surety and fidelity companies now transacting business within this state and on or before June 15, 1909, and at other meetings when in the judgment of the board the necessity arises to fix a maximum schedule of rates of premium to be charged by any fidelity or surety company transacting business within this state, upon each and all, severally of the different kind of bonds, contracts, recognizances, stipulations and undertakings.

"For the purpose of conducting the investigations above provided for the Governor, Attorney General and the State Auditor shall have power by appropriate process to compel the attendance of witness which witnesses shall be paid the same fees as are paid witnesses in the District Court and said officers shall also have authority to examine and inspect all the books, papers and records of any such surety or fidelity company for the purpose of gaining information to enable them to fix such maximum rates of premium. The fees of witnesses and necessary expenses of the Governor, Attorney General and State Auditor shall be paid out of the appropriation made to the Attorney General for use in prosecution under Junkin act.

"Sec. 2. Rates. It shall be the duty of the Auditor of Public Accounts when such maximum of premiums has been so fixed by said officer and not later than June 15, 1909, to send a certified copy of such maximum of premium to each fidelity and surety company authorized to transact business in this state, such maximum or (of) premium shall be in force and effect July 1, 1909, and thereafter, it shall be unlawful for any such fidelity or surety company to exact, charge or receive any greater rate of premium upon any bond, contract, recognizance, stipulation, or undertaking than named in the schedule of rates of premium, so fixed by said officer for the same respectively.

"Sec. 3. Violation of Act, Penalty. If any officer or agent of any such fidelity or surety company shall exact charge, or receive any greater rate of premium for any bond, contract, recognizance, stipulation, or undertaking than that so aforesaid fixed by said board, he shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not less than $100 or more than $500, or be confined in the county jail for a period of not less than 30 days nor more than three months or both at the discretion of the court.

"Sec. 4. Same—Revocation of Authority. The Auditor of Public Accounts shall revoke the authority to transact business in this state of any such company which shall violate the provisions of this act and it shall not again be permitted to transact business within this state for a period of one year thereafter.

"Sec. 5. Emergency. Whereas an emergency exists this act shall take effect and be in force from and after its passage."

The complainant is a company organized under the laws of New York, and a part of its business is the furnishing of surety bonds. For many years it has been authorized to conduct this business in Nebraska and has been furnishing such bonds, charging such rates of premium therefor as it deemed a proper compensation. There are other corporations, some of them organized under the laws of this state, which are engaged in similar business in this state. The state officers named in the act have fixed a maximum rate of premium to be charged for many kinds of surety bonds, and admit that it is their intention to enforce the rates so fixed. The complainant, by this action, seeks to enjoin the enforcement of this act of the Legislature. The defendants' answer alleged that the complainant has not complied with the terms of the act of the Legislature of this state, commonly known as the "Junkin Act." Comp. St. Neb. c. 91a, art. 2, § 4. This act requires the filing of certain sworn statements in the office of the Attorney General of this state. It is sufficient to say that there is no proof that the complainant has not filed such a statement.

Coming to the real question in the case, viz., the validity of the act of the Legislature of 1909, it will be seen that the act applies, in express terms, to both foreign and domestic companies. Therefore the act cannot be sustained upon the doctrine that the state has the right to exclude foreign insurance companies from doing business in the state, as declared in Doyle v. Continental Ins. Co., 94 U. S. 535–542, 24 L. Ed. 148; Security Mut. Life Ins. Co. v. Prewitt, 202 U. S. 246–257, 26 Sup. Ct. 619, 50 L. Ed. 10:

"The act is in general terms, and hits all insurance companies. If it is invalid as to some, it is invalid as to all. United States v. Ju Toy, 198 U. S. 253, 262, 263 [25 Sup. Ct. 644, 49 L. Ed. 1040]. That the requirements of the act might have been made conditions to foreign companies doing business in the state (Fidelity Mutual Life Ins. Co. v. Mettler, 185 U. S. 308 [22 Sup. Ct. 662, 46 L. Ed. 922]; Waters-Pierce Oil Co. v. Texas, 177 U. S. 28 [20 Sup. Ct. 518, 44 L. Ed. 657]) is immaterial, since, as we understand the statute, the Legislature did not attempt to reach the result in that way. A company lawfully doing business in the state is no more bound by a general unconstitutional enactment than a citizen of the state. W. W. Cargill Co. v. Minnesota, 180 U. S. 452 [21 Sup. Ct. 423, 45 L. Ed. 619]." Carroll v. Greenwich Ins. Co., 199 U. S. 401–409, 26 Sup. Ct. 66, 67, 50 L. Ed. 246; National Council, etc., v. State Council, etc., 203 U. S. 151–162, 27 Sup. Ct. 46, 51 L. Ed. 132.

The real controversy in the case is over the power of the state to fix the rates to be charged for insurance. No case has been cited where such a question has previously arisen, although acts somewhat to the same effect have been passed in other states. Laws of New Hampshire 1899, c. 85, § 1; Laws of Kansas, 1909, c. 152, § 3. May the state exercise this power, in view of the fourteenth amendment to the Constitution of the United States which declares that no state

shall "deprive any person of life, liberty, or property, without due process of law."

The liberty to enter into contracts is not an unrestricted liberty, but is subject to the police power of the state. The extent to which the state may go, in the exercise of this power, in regulating or prescribing the prices of goods or services is not clearly defined. In earlier days, it was usual for Parliament to fix the rates which lawfully could be charged even by those who were engaged in private business, and such legislation also existed in the colonies before the adoption of our Constitution. Freund on Police Power, § 318. The right to regulate the charges for services of those whose business is devoted to a public use has been thoroughly established. It is also well settled that the right exists in the state to regulate the charges to be made by those whose business is affected by a public interest. Muhn v. Illinois, 94 U. S. 113–125, 24 L. Ed. 77; Budd v. New York, 143 U. S. 517–544, 12 Sup. Ct. 468, 36 L. Ed. 247; Brass v. North Dakota, 153 U. S. 391, 14 Sup. Ct. 857, 38 L. Ed. 757. The three cases just cited involved the validity of statutes regulating the charges which lawfully might be made by those owning grain elevators, and in each case it was declared that the business conducted by them was so affected with a public interest that the state could regulate the charges imposed by them. Some of the characteristics of that business which led the court to declare it to be affected with a public interest were: The practical monopoly of the business at the places where it was carried on, and the consequent power to levy tribute upon the community; its relation to the business of transportation, and to the business of common carriers—thus being of a quasi public character. The business of the companies engaged in furnishing surety bonds has none of these characteristics. It is in no way a monopoly, for individuals and partnerships are free to furnish such bonds in competition with them, and to make any charge or no charge for assuming such risks. No one is compelled to resort to the surety companies as practically the only source from which may be obtained surety bonds. The public interest in the business of such companies is no different in kind, from its interest in the business of any large mercantile or manufacturing company, whose capital, experience, and facilities may enable it to have a widely extended patronage, but such characteristics do not make the business one which is affected with a public interest. State v. Associated Press, 159 Mo. 410, 60 S. W. 91, 51 L. R. A. 151, 81 Am. St. Rep. 368.

If the state may fix the amount of compensation for which an insurer may lawfully contract for furnishing such insurance, the state may dictate the price for which all other commodities shall be sold, including the price which may be paid for labor. This cannot be done. The fourteenth amendment to the Constitution protects the right of those engaged in purely private business to fix the price at which they will sell their services or commodities.

The case of Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238–246, 22 Sup. Ct. 881, 46 L. Ed. 1144, involved the right of Congress to regulate the charges to be made by any person or tele-

phone company doing business in the District of Columbia for the use of such telephones. The court said:

"And we start with the proposition that it cannot be presumed that a Legislature intends any interference with purely private business. It cannot ordinarily prescribe what an individual or corporation, engaged in a purely private business, shall charge for services, and therefore, although the language of a statute may be broad enough to include such private business. it will generally be excepted therefrom in order to remove all doubts of the validity of the legislation. It appears that some portion of the defendant's business is of a purely private nature, the receipts whereof are spoken of in its reports as private rentals, and as to such business Congress could not, if it would, prescribe what shall be charged therefor. In many buildings, both those belonging to the government or the district, and those belonging to private individuals, is what may be called a local telephone plant—that is, an arrangement of telephones by which parties in different rooms can communicate with each other—a system which is not connected with the general telephone exchange, and is no more public in its nature than the speaking tubes or call bells in a building. It is only for the personal use of parties in the building. By it those in the building cannot communicate with the general public, nor can such public reach parties in the building. It is simply a local convenience for the use solely of those who are in the building. Such combinations of telephone instruments in a single building, with no outside connections, are furnished by the defendant, and the rentals therefrom, as well as the expenses thereof, are entered in its books of account, and constitute a part of its business. The mere fact that such telephones are furnished by the company, which also does a public business, does not make them a part of such public business, or subject them to the regulation by Congress of its charges. A railroad company may, if authorized by its charter, carry on not simply its strictly railroad business, but also an establishment for the manufacture of cars and locomotives. The fact that it is engaged in these two different works would not in itself subject the manufacturer of cars and locomotives to the supervision of the Legislature, although such body would have the right to regulate the charges for railroad transportation. So, in an inquiry into the reasonableness of the charges imposed by Congress in this legislation, it is essential that the receipts and expenses from such private telephone systems be excluded from consideration."

Ex parte Dickey, 144 Cal. 234, 77 Pac. 924, 66 L. R. A. 928, 103 Am. St. Rep. 82, was a case involving the validity of an act of the California Legislature limiting the compensation which an employment agent may receive to 10 per cent. of a month's wages in the employment furnished. In holding the act invalid the Supreme Court of that state said:

"The petitioner is engaged in a harmless and beneficial business. As part of his 'property' in that business are the services that he renders in obtaining employment for those seeking it. It is not compulsory upon any one to employ him, and who so seeks to avail himself of his services is at liberty to reject them if the terms of the contract for compensation are not satisfactory to him. This right of contract common to all legitimate occupations is an asset of the petitioner in his chosen occupation, and, as has been said, is a part of the property in the enjoyment of which he is guarantied protection by the Constitution. By the act in question he is arbitrarily stripped of this right of contract, and deprived of his property, and left, in following his vocation and in pursuit of his livelihood, circumscribed and hampered by a law not applicable to his fellow men in other occupations. Such legislation is of the class discussed by Judge Cooley in the paragraph above quoted—'entirely arbitrary in its character, and restricting the rights, privileges, or legal capacities' of one class of citizens 'in a manner before unknown to the law.' For such legislation, as he very justly adds, those who claim its validity should be able to show a specific authority therefor, 'instead of calling

upon others to show how and where the authority is negatived.' And where, it may be asked, could the line be drawn, if the Legislature. under the guise of the exercise of its police power, should thus be permitted to encroach upon the rights of one class of citizens? Why should not the butcher and the baker, dealing in the necessaries of life, be restricted in their right of contract, and consequently in their profits, to 10, 5, or 1 per cent.? Why should not the contractor, the merchant. the professional man, be likewise subjected to such paternal laws, and why might not the Legislature fix the price and value of the services of labor? The law is clearly one of those, the danger of whose enactment was foreshadowed by this court in Ex parte Jentzsch, 112 Cal. 468, 44 Pac. 803, 32 L. R. A. 664, when it said: 'So, while the police power is one whose proper use makes most potently for good, in its undefined scope and inordinate exercise lurk no small danger to the republic. For the difficulty which is experienced in defining its just limits and bounds affords a temptation to the Legislature to encroach upon the rights of citizens with experimental laws, none the less dangerous because well meant.' "

In the case of People v. Coler, 166 N. Y. 1, 59 N. E. 716, 52 L. R. A. 814, 82 Am. St. Rep. 605, the court had before it an act of the Legislature of New York providing that laborers on public works should be paid the prevailing rate of wages. This provision of the statute was held to be void, and the court said:

"The contractor is a private individual, engaged in private business. When he enters into a fair and honest contract for some municipal improvement, that contract is property, entitled to the same protection as any other property. It is not competent for the Legislature to deprive him of the benefit of this contract by imposing burdensome conditions with respect to the means of performance or to regulate the rate of wages which he shall pay to his workmen, or to withhold the contract price when such conditions are not complied with in the judgment of the city. When he is not left free to select his own workmen upon such terms as he and they can fairly agree upon, he is deprived of that liberty of action and right to accumulate property embraced within the guaranties of the Constitution, since his right to the free use of all his faculties in the pursuit of an honest vocation is so far abridged."

In Street v. Varney Electrical Supply Co., 160 Ind. 338, 66 N. E. 895, 61 L. R. A. 154, 98 Am. St. Rep. 325, an act of the Indiana Legislature was in question. It provided that unskilled labor employed on any public work of the state, counties, cities and towns should receive not less than 20 cents an hour. In holding this law to be in violation of the fourteenth amendment to the Constitution of the United States, the court said:

"If the Legislature has the right to fix the minimum rate of wages to be paid for common labor, then it has the power to fix the maximum rate. And if it can regulate the price of labor, it may also regulate the prices of flour, fuel, merchandise, and land. But these are powers which have never been conceded to the Legislature, and their exercise by the state would be utterly inconsistent with our ideas of civil liberty. Among the most odious and oppressive laws ever enacted by the English Parliament, in the worst of times, were the statutes of labor of Henry VI and Edward III. These enactments fixed a maximum rate of wages for the laboring man, prohibited him from seeking employment outside of his own county, required him to work for the first employer who demanded his services, and punished every violation of the statutes with severe penalties. In the very nature and Constitution of things, legislation which interferes with the operation of natural and economic laws defeats its own object, and furnishes to those to whom it professes to favor few of the advantages expected from its provisions. The circumstances that the act of March 9, 1901 [Laws 1901, c. 122], reverses the conditions of the statutes of labor of Henry VI and Edward III, and lays

the burden and the penalty upon the employer instead of the laborer, does not render it any less pernicious and objectionable as an invasion of natural and constitutional rights. Statutes similar to this have been before the courts of other states, and in nearly every instance have been held unconstitutional."

See, also, State v. Norton, 5 Ohio N. P. 183; State v. Firecreek Coal and Coke Co., 33 W. Va. 188, 10 S. E. 288, 6 L. R. A. 359, 25 Am. St. Rep. 891.

The act of the Nebraska Legislature of 1909 falls within the principles announced in these cases, and, as it does not seem that the portions of the act are separable, the whole act must be declared void, and its enforcement will be enjoined.