STATE, EX REL. GRANT G. MARTIN, ATTORNEY GENERAL, ET AL., RELATORS, V. WILLIAM B. HOWARD ET AL., RESPONDENTS.

STATE, EX REL. WILLIAM B. HOWARD, AUDITOR OF PUBLIC ACCOUNTS, RELATOR, V. LAWSON G. BRIAN ET AL., RESPONDENTS.

FILED MAY 29, 1914. Nos. 18,175, 18,213.

1. **Constitutional Law:** INSURANCE CODE: VALIDITY. A comprehensive act of the legislature, such as chapter 154, laws 1913, commonly known as the "Insurance Code," consisting of 11 articles and 183 sections, the evident purpose of its enactment being to cover and codify the law upon the whole subject of insurance, will not be held invalid for the reason that a portion of a proviso to one section was not correctly copied into the enrolled bill which was signed by the officers of the legislature and by the governor, or on account of the inclusion in another section of an invalid minor provision, when it does not appear that the defective portions constituted the inducement to the passage of the act, and when the objectionable parts may be eliminated and still leave an enforceable law which expresses the legislative will.

State, ex rel. Martin, v. Howard.

2. ———: Delegation of Legislative Power. ''In order to justify the courts in declaring invalid as a delegation of legislative power a statute conferring particular duties or authority upon administrative officers, it must clearly appear beyond a reasonable doubt that the duty or authority so conferred is a power that appertains exclusively to the legislative department, and the conferring of it is not warranted by the provisions of the constitution.'' *State v. Atlantic C. L. R. Co.*, 56 Fla. 617.

3. Insurance: Standard Form of Policy: Construction of Statute. By the terms of the act the insurance board created thereby is directed to prepare a form of fire insurance policy ''as nearly as practicable in the form known as the New York standard.'' Many provisions are contained in other sections of the act denying contract provisions contained in the New York standard form, and permitting others not so contained. *Held,* That it was the intention of the legislature that the New York form should be adopted as the basis of the insurance contract, and that the words ''as nearly as practicable'' should be construed to mean ''as nearly as practicable'' considering all other provisions contained in the insurance code which are inconsistent with or modify the provisions of the New York standard form.

4. ———: ———: ———: Constitutionality. The duty of the board in this regard is to arrange and prepare in proper form the form of contract required under this statute, omitting all provisions of the New York form which are in conflict with the provisions of the code. Its duties are, therefore, ministerial or administrative, and not legislative, and the section imposing the duty is not an unconstitutional delegation of legislative power.

5. ———: ———: Validity of Statute. That portion of the section referred to which provides that the New York form shall be used as it ''may be hereafter'' constituted is invalid, because its effect would be that the future action of the legislature of another state would govern and control the duties of officials in this state, and would require legislative action by the board.

6. Constitutional Law: Insurance Code: Rates. Sections 147, 148 and 149 of the act in question, permitting the establishment of maximum rates of premium for surety and fidelity companies under certain circumstances by the insurance board, are not void on account of taking property without due process of law, or as being an unlawful delegation of legislative power.

7. ———: Delegation of Legislative Power. ''Authority to make rules and regulations to carry out an expressed legislative purpose, or for the complete operation and enforcement of a law within designated limitations, is not an exclusively legislative power. Such authority is administrative in its nature, and its use by administrative

officers is essential to the complete exercise of the powers of all the departments." *State v. Atlantic C. L. R. Co.,* 56 Fla. 617.

8. ———: PRESUMPTIONS: INSURANCE BOARD. The court, in an action brought by a public official and member of the board created by the law, will not anticipate, for the purpose of declaring a law unconstitutional, that the acts of the board, to which is committed its administration, will in the future infringe upon the rights of others, or deprive persons of property without due process.

9. **Foreign Corporations:** LEGISLATIVE CONTROL. The state may impose such conditions and limitations as it sees fit upon foreign corporations seeking the privilege of doing business in this state.

No. 18,175. Original application for a writ of mandamus to compel respondents to deliver to the insurance commission the records of the insurance department. Writ allowed; and, on motion to recall writ, *motion overruled.*

*Grant G. Martin, Attorney General,* for relators.

*Stout, Rose & Wells* and *Wilmer B. Comstock,* for respondents.

No. 18,213. Original information in *quo warranto* to oust respondents from the insurance commission. *Proceedings dismissed.*

*Stout, Rose & Wells* and *Wilmer B. Comstock,* for relator.

*Grant G. Martin, Attorney General,* for respondents.

*Burkett, Wilson & Brown, E. C. Strode, W. O. Temple* and *J. H. Broady, amici curiæ.*

LETTON, J.

This is an original information in *quo warranto* brought to oust the governor of the state and the attorney general from the positions of members of the state insurance board, and to oust Lawson G. Brian from the office of secretary of such board, to which he was appointed by the officers named, acting as the insurance board. The relator is the auditor of public accounts. He claims the right to ad-

minister the insurance department by virtue of the stat-
utes which were in force when he assumed his office. The
respondents admit that at the time he became state au-
ditor he was charged with the administration of the in-
surance department of the state, with the custody of the
records, books and accounts of that department, and the
safe keeping of deposited securities, and that he took
charge of and administered this department until on or
about the 19th day of July, 1913. They claim to hold the
office called in question by virtue of an act passed and ap-
proved upon April 18, 1913, and popularly known as the
"New Insurance Code." The relator maintains that this
act is in conflict with the constitution and void for a num-
ber of reasons, which will be considered in the order in
which they are presented in the relator's brief.

The title to the act the validity of which is attacked in
this proceeding is "An act to provide for the organiza-
tion and government of insurance companies and to regu-
late, supervise and control the business of insurance in
Nebraska, to provide penalties for its violation, to provide
for an insurance board and define its duties and powers,
and to repeal chapter 31 of the Revised Statutes of 1913,
being chapter 24 of Cobbey's Annotated Statutes of Ne-
braska, for 1911 (C. S., ch. 16, secs. 1-14$a$; ch. 43; ch. 28,
sec. 47) and all acts and parts of acts in conflict there-
with." It was introduced in the senate as Senate File
No. 364 and is chapter 154, laws 1913.

The act is divided into 11 articles. Article I is con-
cerned with definitions alone, and occupies nearly three
pages of text. Article II provides for a state insurance
board, and prescribes its constitution, powers and duties.
Article III is taken up with general provisions. Article
IV treats of kinds of insurance and organization of com-
panies. Article V covers the subject of reserves. Article
VI: Standard Forms and Provisions. Article VII: Gen-
eral Provisions Covering Fire Companies. Article VIII:
General Provisions Governing Life, Health and Accident
Companies. Article IX: Assessment Associations. Ar-
ticle X: Miscellaneous Provisions. Article XI: Frater-

nal Insurance. The whole act consists of 183 sections. The evident purpose of the enactment was to cover and codify the whole subject of insurance in every phase, to embody necessary reforms, and to substitute a harmonious arrangement in orderly sequence for the badly arranged mass of insurance legislation which formerly appeared upon the statute books.

By this act a state insurance board is created, "which shall consist of the governor, who shall be *ex officio* chairman thereof, the auditor of public accounts, and the attorney general, a majority of whom shall constitute a quorum." This board is given general supervision, control and regulation of insurance companies of all kinds, and of the business of insurance in Nebraska. It is also provided that immediately upon the taking effect of the act the auditor shall surrender to the state insurance board all the records, books, blanks, reports and other property pertaining to insurance and the insurance department, together with all the securities and properties of insurance companies now held by him, and the board was authorized to elect and appoint with other officers "a secretary of the board, who shall be known and styled herein as 'Insurance Commissioner.'"

After the act took effect the auditor refused to assemble with the other members of the insurance board or take any part in its deliberations, and refused to deliver to Lawson G. Brian, the insurance commissioner appointed by the board, the records, books, blanks, securities and other property held by him by virtue of former statutes. In July, 1913, an application for a peremptory writ of mandamus to compel him and subordinate officers of his department to deliver such books and securities to the board was granted by this court and complied with by him. A motion was afterwards filed by him to vacate the peremptory writ. This motion is now pending. In August, 1913, this action in *quo warranto* was begun. The same points are urged in both cases by the auditor, who is relator in the *quo warranto* case, and respondent in the

mandamus proceedings. Both cases, therefore, will be considered and disposed of in this opinion.

Coming now to the contention of the relator, it is first claimed that the act in the form in which it was enrolled and presented to and approved by the governor did not pass either house of the legislature, and that it is void for that reason. It is alleged that when the bill was finally agreed to by the senate and house, in its provisions with reference to the governing body of fraternal beneficiary associations, it was "provided, that the elected members shall not have less than three-fourths of the vote, nor less than the votes required to amend its constitution and by-laws," but that after the bill had been agreed to and passed, the enrolling clerk or clerks, either through fraud or error, materially altered and radically changed the proviso to read, as follows: "Provided, that the elected members shall have not less than nine-tenths of the vote nor less than the vote required to amend its constitution;" and as so enrolled and presented to the governor this proviso was never agreed to or passed by the legislature of either house; that it was only through the appointment of a conference committee, and the approval and recommendation of that committee in fixing the ratio of the vote of elected members to that of the total governing body at three-fourths, that the houses were able to agree upon its passage, and that the agreement upon this ratio was a material inducement to the passage of the act.

Section 1, ch. 47, laws 1897 (Ann. St. 1911, sec. 6635), provides: "A fraternal beneficiary association is hereby declared to be a corporation, society or voluntary association, formed or organized and carried on for the sole benefit of its members and their beneficiaries, and not for profit. Each such society shall have a lodge system, with ritualistic form of work and representative form of government." This provision, with the word "society" substituted for the word "association" as the fourth word, formed section 156 of the new act when first introduced. The evidence shows that it was amended in the senate by adding: "Any such society shall be deemed to have a

representative form of government when it shall provide in its constitution and laws for a supreme legislative or governing body composed of representatives elected either by the members, or by delegates elected directly or indirectly by the members, together with such other·members as may be prescribed by its constitution and laws; provided, that the elected members shall constitute three-fourths in number, and have not less than nine-tenths of the vote, nor less than the votes required to amend its constitution and laws," etc. The bill passed the senate with this and many other amendments. Many amendments were made in the house. A conference committee was appointed, who agreed in their report, and as finally adopted by the house and senate the first proviso to section 156 should read: "Provided, that the elected members shall constitute three-fourths in number, and have not less than three-fourths of the vote, nor less than the votes required to amend its constitution and laws," etc. In the enrolled bill which was actually signed by the officers of the legislature and approved by the governor this portion of the proviso reads: "Provided, that the elected members shall have not less than nine-tenths of the vote, nor less than the votes required to amend its constitution and laws."

It seems clear from the changes made in its progress that the discrepancy is a mere clerical error, and that the enrolled bill as presented to the governor, so far as concerned this proviso, did not express the legislative will. The governor is a part of the law-making department, but his approval of that which never in fact passed the legislature can give it no vitality. Neither can the true intendment of that which actually was enacted by the legislature be given force and validity (except under circumstances provided for in the constitution) unless it has met the approval of the governor. For these reasons, we are of opinion that the portion of the proviso that the elected members "shall have not less than nine-tenths of the vote, nor" was not enacted in accordance with the requirements of the constitution, and is of no effect.

Can it with reason be said that this was the inducement to the passage of the act, and that for this omission the whole act should be declared void? It has consistently been the doctrine and practice of this court in cases where the validity of an act of the legislature governing a whole subject, and practically codifying the law thereon, is attacked because of defective provisions, and it is not clear that the defective section, subdivision or proviso was the inducement to the passage of the whole act, and it appears that the objectionable portion may be eliminated without interfering with the general scope and purpose of the legislation, that the whole act will not be held invalid on that account, but that, if the valid and invalid parts are so intermingled that they cannot be separated and leave an enforceable law expressing the legislative will, the whole act will fall. *State v. Adams Express Co.*, 85 Neb. 25; *State v. Junkin*, 85 Neb. 1; *State v. Fleming*, 70 Neb. 529. It would indeed be a serious addition or omission which would justify a court in declaring the whole scheme of legislation void. We are of opinion that, since the omission of the defective portion of the proviso, to wit, "not less than nine-tenths of the vote, nor," leaves the portion of the law relating to fraternal beneficiary associations unambiguous and enforceable, the whole act may stand.

It is next contended that sections 100 and 138 of the act are invalid because they attempt to confer legislative authority upon the insurance board. Section 100 provides: "No fire insurance company shall issue any fire insurance policy covering any property or interest therein in this state other than on a form prescribed by the insurance board as nearly as practicable in the form known as the New York standard as now or may be hereafter constituted, except as follows." Then follows subdivisions from 1 to 10 authorizing and permitting insurance companies, at their option, to write or print in the policies a large number of other stipulations not contained in the New York standard form, and permitting combination policies including loss by fire, hail, lightning and tornado to be written. Section 138 provides: "No insurance pol-

icy or certificate of any kind shall be issued or delivered in this state unless and until a copy of the form thereof has been filed with the insurance board and approved by it."

It is insisted, under the authority of *O'Neil v. American Fire Ins. Co.,* 166 Pa. St. 72, 26 L. R. A. 715; *Anderson v. Manchester Fire Assurance Co.,* 59 Minn. 182; *Dowling v. Lancashire Ins. Co.,* 92 Wis. 63, 31 L. R. A. 112; *King v. Concordia Fire Ins. Co.,* 140 Mich. 258, that provisions in a statute authorizing and directing the insurance commissioner to prepare a standard form of policy surrender to the commissioner the function of legislation, and are void for that reason. In *O'Neil v. American Fire Ins. Co., supra,* the court, after defining the words "legislative power" to mean "the power or authority, under the constitution or frame of government, to make, alter and repeal laws," state that this is a power that cannot be delegated, and, after examining a number of the cases in that state, say: "The effect of our cases is to settle firmly the rule that the law must be complete in all its terms and provisions when it leaves the legislative branch of the government, and that nothing must be submitted to the judgment of the electors or other appointee of the legislature except an option to become or not to become subject to its requirements and penalties." The law attacked in that case directed the insurance commissioner to prepare "a printed form in blank, of a contract or policy of fire insurance, together with such provisions, agreements or conditions as may be indorsed thereon or added thereto and form a part of such contract or policy; and such form when filed shall be known and designated as the standard fire insurance policy of the state of Pennsylvania." Another section made the use of this standard form obligatory upon fire insurance companies doing business in the state after a certain date, and provided penalties for failure to do so. The principal reasons given by the court for declaring the act unconstitutional were: (1) It does not fix the terms and conditions of the policy. (2) It delegates the power to prescribe its form and conditions to a single individual. (3) The appointee is not

State, ex rel. Martin, v. Howard.

named, but is the person who may happen to be insurance commissioner at the time the form is to be prepared. (4) The form "does not become part of the statute in fact, is not recorded in the statute book, and no trace of it can be found among the records of either branch of the legislature." (5) "The appointee had until the following November to prepare and file the form of policy over which when filed the legislature had no control whatever. They did not consider, they had no knowledge of, the form which they required all companies doing business in the state to adopt, and the use of which they compelled by heavy penalties."

It will be seen that the reasons given by the court for its decisions do not apply to the Nebraska act. The form of insurance policy which the legislature adopted, known as the New York standard, is a definite and well-known form of contract. Its characteristics, terms and conditions are known and recognized by the legislature of New York and other states, and are familiar to all carrying on the business of fire insurance.

In addition to the provisions embodied in the New York form, a large number of other conditions and limitations upon the contract specified in the statute may be added by the insurance companies at their option. The insurance board is not vested with the power to forbid or in anywise interfere with any of these provisions. As to all these matters the statute leaves the companies unfettered, and does not confer upon the insurance board any legislative powers whatever. The only matter in which any discretion in this regard is left to the board is that the form it is required to prepare shall be "as nearly as practicable in the form known as the New York standard, as now or may hereafter be constituted." This is an exceedingly narrow limitation which was no doubt inserted in order that the form of the New York policy might be modified so as to conform to a number of other provisions in the act which would be inconsistent with it if copied in its original form.

In contradistinction and antithesis to the objectionable provisions of the Pennsylvania statute, this act (1) fixes the terms and conditions of the policy; (2) does not dele-·gate the power to a single individual; (3) the insurance board is not given unlimited power, but, as we construe the act, is confined to the code provisions in preparing the form of policy; (4) the form of the policy is, in fact, "re·corded in the statute book" in the form of the well-known New York standard and modifications contained in the .act; and (5) the legislature did consider and had knowledge of the form which they required the insurance companies to adopt.

In Wisconsin and Minnesota the insurance commissioner was required by a special statute, not forming a part of a general act or code regulating the business of insurance, to prepare and adopted a printed form of fire insurance policy, "and such form shall, as near as the same can be made applicable, conform to the type and form of the New York standard fire insurance policy, so-called and known; provided, however, that five days' notice of cancelation by the company shall be given, and provided, that proof of loss shall be made within 60 days after a fire." He was .authorized to call upon the attorney general for assistance in its preparation, and it was made the duty of the attorney general to assist him in the work. After the forms had been prepared and put in use, an action was begun in each ·of these states by a policyholder who had suffered a loss. In the Wisconsin case the standard form which was used provided that the policy should be void if it insured per·sonal property being, or to become, "incumbered by a ·chattel mortgage," and provided that no representative of the company could waive any of the provisions or conditions of the policy, unless the waiver was written thereupon. The court held that a parol waiver was sufficient to allow the insured to recover, because the act permitting the insurance commissioner to prepare a standard form of policy was void.

In the opinion the Wisconsin court said it was impossible to adopt the New York standard without repealing

State, ex rel. Martin, v. Howard.

the valued policy law and the general insurance law, as well as other provisions for the cancelation of policies, proofs of loss, etc. The act did not contain a repealing clause. It provided that the policy should "conform to the type and form of the New York standard," and the court say: "Had the commissioner wholly declined to prepare, approve, and adopt any form whatever, it would not have been possible to carry into effect so imperfect or uncertain an enactment, or to transact business under it." Within the lines indicated, a discretion was reposed in the commissioner as to the form of the policy which embodied the existence of the contract, and which was to have the sanction and force of law. The effect clearly was to transfer to him bodily the legislative power of the state on that subject. "Conceding that the legislature might have adopted the New York form as an entirety by the use of general language, it is evident that the proposed form, to conform 'as near as can be to the form adopted in New York,' involved a duty equivalent to that of revision, which it cannot be contended could be delegated, except subject to legislative approval," and held that the objection that the form had not received the legislative sanction was fatal, citing the Pennsylvania and Minnesota cases. *Dowling v. Lancashire Ins. Co.*, 92 Wis. 63, 31 L. R. A. 112.

The Minnesota court took the same ground, and held there was not such a distinction between the Minnesota statute and that of Pennsylvania as to take away from the insurance commissioner the power to insert in the standard form such provisions as he saw fit, and that the act attempted to clothe him with power to enact a general law prescribing the provisions and conditions which should and should not be inserted in a policy of insurance.

The Michigan statute considered in the case of *King v. Concordia Fire Ins. Co.*, 140 Mich. 258, was subject to the same objections as the Pennsylvania act, since it gave the sole power to the insurance commission to prescribe the form, and made no reference to any standard form

96 Neb. 19

already in existence.  We have no fault to find with the
opinion in this case, or with that of the supreme court of
Pennsylvania.  It will be observed that in both the Minne-
sota and Wisconsin cases the form prepared by the in-
surance commissioner contained provisions not in the
standard form, which militated against the interests of
the insured, and the decision of the court holding the in-
surance commissioner had no power to prepare a stand-
ard form prevented a forfeiture in each case.  It may also
be noted that the words of the Minnesota and Wisconsin
statutes, providing that the form "shall, as nearly as can
be made applicable, conform to the type and form of the
New York standard fire insurance policy," are contained
in an act which was concerned with that subject alone,
and the words "as nearly as can be made applicable" could
have no reference to any other provisions in that act.

The act which we are now considering consists of nearly
200   sections.   Scattered throughout there are sections
which are inconsistent with the New York standard form,
such as the provisions in section 49 which prohibit the in-
sertion in any policy of a stipulation "that such policy
shall be construed according to the laws of any other state
or country, or any provision limiting the time within
which an action may be brought to less than the regular
period of time prescribed by the statute of limitations of
this state, unless otherwise prescribed by this act," and
the provision in section 74 providing for valued policies.

We are of the opinion that it was the intention of the
legislature that the New York form should be adopted as
the basis of the insurance contract, and that the words
"as nearly as practicable" should be construed to mean as
nearly as practicable considering the other provisions con-
tained in the insurance code which in anywise are incon-
sistent with or modify the provisions of the New York
standard form of contract.   By this construction, the board
is not allowed to legislate, but only to arrange and prepare;
the powers given are delegable by the legislature, and the
sections attacked are valid.  *Aetna Life Ins. Co. v. Hardi-
son,* 199 Mass. 181.  If the language of a statute is suscep-

tible of a reasonable construction which will uphold its constitutionality, it is the duty of the court to adopt such construction, if at all consistent with common sense and reason.

That portion of the section which provides the form shall be used as it "may be hereafter" constituted is too indefinite and uncertain to be valid. It would leave the form to the future action of the New York legislature or insurance commissioner, is surplusage, unconstitutional, and void.

Sections 147, 148 and 149 of the act are assailed upon three grounds: (1) Because it is said they delegate legislative functions; (2) because they fix the compensation of a personal risk or a private risk; and (3) because the subject matter of the sections has been condemned by a specific determination in the circuit court of the United States for the district of Nebraska. These sections are concerned only with the rates of premium charged by surety and fidelity companies transacting business within this state, permit the insurance board, when a necessity arises, to fix a maximum schedule of rates or premium to be charged upon insurance contracts of the nature specified, and further provide that it shall be unlawful for any fidelity or insurance company to charge or receive any greater rates than those so fixed. A penalty is provided if any officer, agent or inspector violates these provisions. While in the case of the *American Surety Co. v. Shallenberger*, 183 Fed. 636, the United States circuit court for this district adjudged like provisions in a former statute of this state to be in violation of the Fourteenth amendment to the constitution of the United States, in the very recent case of *German Alliance Surety Co. v. Barnes*, 189 Fed. 769, the district court of the United States, and the supreme court of the United States, in the same case, reported under the title of *German Alliance Surety Co. v. Lewis*, 233 U. S. 389, reached the conclusion that the provisions of the Kansas statute permitting the superintendent of insurance of that state to fix maximum rates upon fire insurance policies were valid. The question

how far, under the constitution of the state of Nebraska, and of the constitution of the United States, a legislative or administrative officer appointed by the legislature may regulate contracts of insurance and fix a maximum rate of premiums or charges is one of first impression in this state, and is of far-reaching importance. The Kansas statute provided for the filing of schedules of rates by every fire insurance company doing business in that state, and that, "when the superintendent of insurance shall determine that any rate made by an insurance company in this state is excessive or unreasonably high, or that said rate is not adequate to the safety or soundness of the company granting the same, he is authorized to direct said company to publish and file a higher or lower rate, which shall be commensurate with the character of the risk, but in every case the rate shall be reasonable." The collection or receiving of any other rate than that authorized by the superintendent was declared to be unlawful, and penalties were provided for a violation of the act. Practically the same argument was made as is made here. In the opinion by Pollock, district judge, the question is stated as being: "Can it be said the state must be denied the right to regulate the rates and charges of either foreign insurance companies transacting business within her borders, as is complainant, or domestic insurance corporations of her own creation, in the exercise of her reserved powers, having in view the great magnitude of the business transacted by such companies, its intimate relation to the commercial business world, and the direct influence the business so transacted has on the prosperity of the individual citizen affected thereby?" Basing its decision upon the principles announced in *Noble State Bank v. Haskell*, 219 U. S. 104, and comparing the business of banking with that of insurance, the court hold: "The state may take under its control the whole subject of fire insurance and conduct its operations in such manner by such agencies and on such terms and conditions as to form of contract, compensation to be paid for the indemnity from risks secured by its citizens, as the law-making power may

in its wisdom prescribe." It is further said: "Again, the power of the state over the transaction of corporate insurance companies, foreign or domestic, * * * must be conceded to be as plenary as is the power of congress over interstate commerce under the commerce clause, if we lay aside from consideration, for the moment, the public nature of such interstate commerce." The court also suggests that it is not entirely clear at this late day that the business of fire insurance, although in its nature private, will continue to be regarded as one which is entirely unaffected with a public use.

When the case reached the supreme court of the United States, the opinion was written by Mr. Justice McKenna. That court boldly grasps the nettle, and holds in conformity with the suggestion of the more conservative district court that a nation-wide business, such as that of fire insurance, is affected with a public interest which justifies its regulation, even to the extent of fixing maximum rates by an administrative agency or department of the government. The court goes back to the maxim of Lord Hale that, when private property is "affected with a public interest, it ceases to be *juris privati* only," which was amplified and applied in the opinion in *Munn v. Illinois,* 94 U. S. 113, holding that private property becomes clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. A vigorous dissent was filed by Mr. Justice Lamar, concurred in by the Chief Justice and Mr. Justice Van Devanter. It is probably true that the dissenting opinion expresses views which have heretofore been generally held by most lawyers, and that strict adherence to the doctrine of most of the cases intervening between the Granger cases and *Noble State Bank v. Haskell, supra,* would have made the dissenting opinion the opinion of the court; however, we are living in an era of changing economic conditions, and one of the chief glories of the common law is, and has been, that it is not fixed and certain from generation to generation, but that it follows the trend of the times and meets occasions as they arise. In 1674 Sir John Davis, in his

eulogy of the common law (Preface to Davis Reports) in speaking of conflicting judgments, said: "It is objected that our later judgments do many times cross and contra- dict the former directly, in one and the same point of law, which is a manifest argument of uncertainty in the law. Assuredly there are very few precedents of such contrary judgments, scarce two in one age. And yet, if the reasons of the later judgments did appear of record, we should find them grounded upon mischiefs and inconveniences aris- ing since the former judgments, or upon other weighty considerations, respecting the good of the commonwealth in general." The police power of the state may be em- ployed as said in *Noble State Bank v. Haskell, supra,* "in aid of what is sanctioned by usage, or held by the prevail- ing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

We are convinced that, in the light of the case referred to, there is doubt as to whether the legislature had ex- ceeded its constitutional limitations. In such case the law- making body is entitled to the benefit of the doubt; only a clear case of violation will justify the court in interfering, and this has not been shown.

The complaint is made that subdivision 8, sec. 101, is void because it regulates the interest on money in special cases, and deprives insurance companies of their property without due process of law. The state may in the exercise of its police power in the regulation of different forms of business prescribe rates of interest which may be charged. These are not local or special laws, but general laws affecting all members of a class. The statute permits parties to contract for any rate of interest not exceeding 10 per cent. per annum; but this does not prevent the state from fixing a lower rate in its power of regula- tion. The rate of interest to be paid by municipal corpora- tions and counties upon their obligations is fixed by stat- ute, as well as that upon bonds issued by paving districts, sanitary districts and other governmental or administra- tive subdivisions. The rate of interest upon deposits is fixed in the banking law, and the rate of interest upon

judgments is also fixed.   Neither can the argument based upon the claimed lack of due process be sustained.   It is a matter of common knowledge that policy-loans of the nature provided for in this subdivision are voluntarily offered by leading life insurance companies.   There is room for argument as to whether the reserve from which the loan is made is the property of the company or of the policy-holder, but whatever its status may be until it can be demonstrated that the operation of this subdivision has the effect asserted we would not be justified in declaring the act unconstitutional for this reason.

Attack is also made upon the law on account of the provisions of sections 11, 27 and 92.   These sections all relate to powers given to the board, some of which it may never be called upon to exercise.   Section 11 relates to the winding up and dissolution of insolvent companies and of those refusing to comply with the provisions of the insurance code.   It authorizes the board to apply to the courts for an order directing the company to show cause why the board should not take possession of its records, property and effects, and conduct or close its business, and for such other relief as the nature of the case and the interest of its policyholders, creditors, stockholders or the public may require.   The court is authorized after a hearing to either deny the application, or direct the board to take possession of the property and effects of such company and conduct its business, until, on the application either of the board or of the company, it shall appear that the cause of such order has been removed, and that the company can properly resume the possession of its property.   The court is also given power after hearing to decree the liquidation of the company.   We find nothing objectionable in these provisions.   The only difference between these and the ordinary proceedings for the same purpose is that the board itself is given charge of the affairs of the delinquent corporation under the direction of the court, instead of a receiver appointed by the court.   The whole matter is in the hands of a court of equity, and not in the hands of the board acting as an independent and uncontrolled body.

As to the provisions of section 27, which allow the board to extend the time beyond July 1, 1915, within which existing companies may pay in additional capital stock, this section can only apply to existing companies, not to those hereafter created. There is no showing that any existing company has not already complied with the law and amended its articles, or that the occasion for the exercise of such power will ever arise. A court will not anticipate prospective conditions, which may never arise, in order to declare a law unconstitutional. And so, also, as to section 92. It will not be assumed that any arbitrary action, or any proceeding in violation of the constitutional rights of stockholders or members, or of companies or associations, will ever be taken by the board. The relator is a member of the board, and the court will not presume that he, with the other members, will so transgress. Not until in the administration of the law the board exceeds its powers, or by a harsh and arbitrary use of the forms of law attempts to invade private rights, can the rights of any person or corporation be infringed under these sections. *Business Men's League v. Waddill,* 143 Mo. 495, 40 L. R. A. 501.

The complaint made in the brief of *amici curiæ* that the act is void on account of discrimination against foreign companies by requiring them to comply with certain regulations is also unsound. The state admits them as a matter of grace, and not of right, and may impose conditions upon the right to do business here. *State v. Fleming,* 70 Neb. 523; *State v. Standard Oil Co.,* 61 Neb. 28; *Daggs v. Orient Ins. Co.,* 136 Mo. 382, 35 L. R. A. 227, and cases cited therein. They should, however, be fairly and justly treated, not only as a matter of right, but because of retaliatory provisions in other states. We assume that the purpose of the legislature was not to discriminate against foreign companies, but to take the further precaution for the protection of policyholders in such companies that the fact of nonresidence seemed to it to require. The ultimate result of the working of these provisions was a matter for the legislature to consider, and

not for the court.    Moreover, by section 13 the right
of appeal is specially preserved from any action taken or
order made by the board under the provisions of section
11 which are complained of.

Answering a number of contentions made in the brief,
we agree with the supreme court of Florida: "In order to
justify the courts in declaring invalid as a delegation of
legislative power a statute conferring particular duties or
authority upon administrative officers, it must clearly ap-
pear beyond a reasonable doubt that the duty or authority
so conferred is a power that appertains exclusively to the
legislative department, and the conferring of it is not
warranted by the provisions of the constitution.    *    *    *
Authority to make rules and regulations to carry out an
expressed legislative purpose, or for the complete opera-
tion and enforcement of a law within designated limita-
tions, is not an exclusively legislative power.    Such au-
thority is administrative in its nature, and its use by ad-
ministrative officers is essential to the complete exercise of
the powers of all the departments." *State v. Atlantic C.
L. R. Co.,* 56 Fla. 617, 32 L. R. A. n. s. 639.

We have entered into a discussion of several questions
raised in this case which the relator in his capacity as a
public officer and member of the board perhaps was not
entitled to raise; but we deemed it better to meet the
objections raised and to indicate our views for the guid-
ance of the board.    It is possible that in an act of this
scope and magnitude there may be inconsistent and inhar-
monious provisions embraced, and that it will take the
process of amendment to render the legislation most val-
uable and effective for the purpose for which the code
was compiled.    It is also possible that at some time in the
future the constitutional rights of some person or corpora-
tion may be infringed; but this is apt to occur under any
law regulating such a complex business, and the courts
are open for relief if occasion arises.    Until evidence is
furnished that this has occurred, we find no reason for
finding the law or any of its parts unconstitutional, with

the exception of the two short clauses referred to and so declared.

The motion to recall the writ of mandamus is overruled, and the proceedings in *quo warranto* are

DISMISSED.

ROSE, J., not sitting.