[Crim. No. 1123. In Bank.—July 25, 1904.]

## Ex Parte C. E. DICKEY, on Habeas Corpus.

EMPLOYMENT AGENTS—ACT LIMITING COMPENSATION—CONSTITUTIONAL LAW—POLICE POWER.—The statute passed in 1903 (Stats. 1903, p. 14) limiting the compensation of employment agents, and making it a misdemeanor to receive any money in excess of the percentage therein provided for, is an invalid exercise of the police power, and is unconstitutional and void. [Shaw, J., dissenting.]

ID.—LAWFUL BUSINESS—RIGHT TO MAKE CONTRACTS—PROTECTION OF CONSTITUTION.—Where a lawful business is of a beneficial character, and not dangerous to the public, either directly or indirectly, it cannot be subjected to any police regulation whatever, which does not fall within the power of taxation for revenue. The right to make contracts, common to all legitimate vocations, is a part of the property in the enjoyment of which the person engaged therein is guaranteed protection by the constitution.

WRIT OF HABEAS CORPUS to the Sheriff of the City and County of San Francisco, holding petitioner under judgment of the Police Court of said city and county. George H. Cabaniss, Judge.

The facts are stated in the opinion of the court.

William H. Davis, for Petitioner.

Lewis F. Byington, James M. Hanley, and H. W. Hutton, for Respondent.

HENSHAW, J.—By this writ the petitioner attacks the constitutionality of an act of the legislature defining the duties

and liabilities of employment agents, making a violation of the act a misdemeanor, and fixing penalties therefor (Stats. 1903, p. 14), and in particular section 4 of this act, under which he was charged with and convicted of misdemeanor.

Section 4 reads as follows: "It shall be unlawful for an employment agent in the state of California to receive, directly or indirectly for registration made or for information or assistance such as is described in section 2 hereof, any money or other consideration which is in value in excess of ten per cent of the amount earned, or prospectively to be earned, by the person for whom such registration is made or to whom such information is furnished, through the medium of the employment regarding which such registration, information, or assistance is given, during the first month of such employment; *provided,* that said value shall not be in excess of ten per cent of the amount actually prospectively to be earned in such employment when it is mutually understood by the agent and person in this section mentioned, at the time when said information or assistance is furnished, that said employment is to be for a period of less than one month."

Whether or not the act be a valid exercise of the police power is the single question here calling for determination.

As to the scope of the legislative exercise of the police power, the supreme court of the United States in the recent case of *Holden* v. *Hardy*, 169 U. S. 366, discussing the question of the right of one to pursue an ordinary and legitimate vocation, to acquire property, and to make contracts to that end, says: "This right of contract, however, is itself subject to certain limitations which the state may lawfully impose in the exercise of its police powers. While this power is inherent in all governments, it has doubtless been greatly expanded in its application during the past century, owing to an enormous increase in the number of occupations which are dangerous, or so far detrimental to the health of employees as to demand special precautions for their well-being and protection, or the safety of adjacent property. While this court has held that the police power cannot be put forward as an excuse for oppressive and unjust legislation, it may be lawfully resorted to for the purpose of preserving the public health, safety, or morals, or the abatement of public nuisances, and a large discretion 'is necessarily vested in the legislature to determine

not only what the interests of the public require, but what measures are necessary for the protection of such interests.' " Judge Cooley on Constitutional Limitations, 7th edition, page 837, declares: "The limit to the exercise of the police power in these cases must be this: The regulation must have reference to the comfort, safety, or welfare of society." In the same connection this court has said (*Sonora* v. *Curtin*, 137 Cal. 583) : "A police regulation or restraint is for the purpose of preventing damage to the public or to third persons. There are certain lines of business and certain occupations which require police regulation because of their peculiar character, in order that harm may not come to the public or that the threatened danger may be averted. Where the profession or business is not dangerous to the public, either directly or indirectly, it cannot be subjected to any police regulation whatever which does not fall within the power of taxation for revenue." It appears, therefore, that the due exercise of the police power is limited to the preservation of the public health, safety, and morals, and that legislation which transcends these objects, whatever other justification it may claim for its existence, cannot be upheld as a legitimate police regulation.

The business in which this defendant is engaged is not only innocent and innocuous, but is highly beneficial, as tending the more quickly to secure labor for the unemployed. There is nothing in the nature of the business, therefore, that in any way threatens or endangers the public health, safety, or morals. Nor, indeed, is the purpose of this statute to regulate in these regards, or in any of them. The declared purpose and the plain effect of the above-quoted section is to limit the right of an employment agent in making contracts, a right free to those who follow other vocations, and arbitrarily to fix the compensation which he may receive for the services which he renders.

Here, then, is laid down a most drastic rule governing the conduct of a man in the prosecution of a harmless, legitimate, and beneficial business. Under the constitution of the United States and of this state the protection guaranteed in the possession of property and in the pursuit of happiness is extended, as of necessity it must be, to cover the right to acquire property, and the right to acquire property must and does include the employment of proper means to that end. Says

Judge Cooley (Constitutional Limitations, 7th ed., p. 889):
"The general rule undoubtedly is that any person is at liberty
to pursue any lawful calling, and to do so in his own way, not
encroaching on the rights of others. This general right can-
not be done away." And this court has said (*Ex parte New-
man,* 9 Cal. 517): "The right to protect and possess property
is not more clearly protected by the constitution than the right
to acquire. The right to acquire must include the right to use
the proper means to attain the end. The right itself would be
impotent without the power to use its necessary incidents.
The legislature, therefore, cannot prohibit the proper use of the
means of acquiring property, except the peace and safety of
the state require it." In strict accord with this is the language
of the supreme court of the United States in *Holden* v. *Hardy,*
169 U. S. 366: "As the possession of property, of which a
person cannot be deprived, doubtless implies that such prop-
erty may be acquired, it is safe to say that a state of law
which undertakes to deprive any class of persons of the gen-
eral power to acquire property would also be obnoxious to the
same provision (due process of law). Indeed, we may go a
step further, and say that, as property can only be legally
acquired as between living persons by contract, a general pro-
hibition against entering into contracts with respect to prop-
erty, or having as their object the acquisition of property,
would be equally invalid." And, says Judge Cooley, treating
of this same subject-matter: "The doubt might also arise
whether a regulation made for one class of citizens, entirely
arbitrary in its character, and restricting their rights, privi-
leges, or legal capacities in a manner before unknown to the
law, could be sustained, notwithstanding its generality. Dis-
tinctions in these respects must rest upon some reason upon
which they can be defended—like the want of capacity in
infants and insane persons; and if the legislature should
undertake to provide that persons following some specified
lawful trade or employment should not have capacity to make
contracts, or to receive conveyances, or to build such houses
as others were allowed to erect, or in any other way to make
such use of their property as was permissible to others, it can
scarcely be doubted that the act would transcend the due
bounds of legislative power, even though no express constitu-
tional provision could be pointed out with which it would

come in conflict. To forbid to an individual or a class the right to the acquisition or enjoyment of property in such manner as should be permitted to the community at large, would be to deprive them of *liberty* in particulars of primary importance to their 'pursuit of happiness'; and those who should claim a right to do so ought to be able to show a specific authority therefor, instead of calling upon others to show how and where the authority is negatived."

The application of these principles to the statute under consideration leads to the following irresistible conclusion: The petitioner is engaged in a harmless and beneficial business. As part of his "property" in that business are the services that he renders in obtaining employment for those seeking it. It is not compulsory upon any one to employ him, and whoso seeks to avail himself of his services is at liberty to reject them if the terms of the contract for compensation are not satisfactory to him. This right of contract common to the followers of all legitimate vocations is an asset of the petitioner in his chosen occupation, and, as has been said, is a part of the property in the enjoyment of which he is guaranteed protection by the constitution. By the act in question he is arbitrarily stripped of this right of contract, and deprived of his property, and left, in following his vocation and in pursuit of his livelihood, circumscribed and hampered by a law not applicable to his fellow men in other occupations. Such legislation is of the class discussed by Judge Cooley in the paragraph above quoted, "entirely arbitrary in its character, and restricting the rights, privileges, or legal capacities" of one class of citizens "in a manner before unknown to the law." For such legislation, as he very justly adds, those who claim its validity should be able to show a specific authority therefor, "instead of calling upon others to show how and where the authority is negatived."

And where, it may be asked, could the line be drawn, if the legislature, under the guise of the exercise of its police power, should thus be permitted to encroach upon the rights of one class of citizens? Why should not the butcher and the baker, dealing in the necessaries of life, be restricted in their right of contract, and, consequently, in their profits, to ten, five, or one per cent? Why should not the contractor, the merchant, the professional man, be likewise subjected to such

paternal laws, and why might not the legislature fix the price
and value of the services of labor? The law is clearly one of
those the danger of whose enactment was foreshadowed by
this court in *Ex parte Jentzsch,* 112 Cal. 468, when it said:
"So, while the police power is one whose proper use makes
most potently for good, in its undefined scope and inordinate
exercise lurk no small danger to the republic. For the diffi-
culty which is experienced in defining its just limits and
bounds affords a temptation to the legislature to encroach
upon the rights of citizens with experimental laws, none the
less dangerous because well meant."

We have not, in this discussion, been called upon to con-
sider adjudications from any sister states, for the reason that
no such enactments as this have been passed by their legisla-
tures, or, if passed, have come before their courts for review.
We have been referred to no cases by the respondent. In
Illinois, however, an act not dissimilar in character was passed,
requiring that all coal produced in the state should be weighed
on scales at the mines, and that such weight should be taken
as a basis for computing the wages of the operators, and pro-
hibiting the owners and employees from contracting for labor
on any other basis. In *Millet* v. *People,* 117 Ill. 294,[1] the
defendant was convicted of having failed to furnish a track-
scale as provided in the act, and he appealed. In stating the
proposition the supreme court of Illinois said: "The ques-
tion is thus presented whether it is competent for the general
assembly to single out owners and operators of coal mines,
as a distinct class, and provide that they shall bear burdens
not imposed on other owners of property or employers of
laborers, and prohibit them from making contracts which it
is competent for other owners of property or employers of
labor to make." The court in its discussion quoted Judge
Cooley, as above, and, in declaring the law invalid, said:
"What is there in the condition or situation of the laborer
in the mine to disqualify him from contracting in regard to
the price of his labor, or in regard to the mode of ascertain-
ing the price? And why should the owner of the mine, or the
agent in control of the mine, not be allowed to contract in
respect to matters as to which all other property-owners and
agents may contract?"

---

[1] 57 Am. Rep. 869.

There are but two classes of legislation standing upon the books which bear any similarity to the law here under consideration, but an examination of those classes discloses that the similarity is superficial and not substantial. The first is found in the laws against usury, not recognized in this state, saving in the particular case of pawnbrokers, who are forbidden to charge more ˙than two per cent a month interest. But usury laws, without regard to their wisdom, are a heritage to us from the common law, which we have adopted as the basis of our jurisprudence, and had their origin in the somewhat spiritual and theological notion that it was against the law of God that a thing which was by nature unfruitful should be made to bear fruit, and from time immemorial have been upheld as police regulations. (*Ex parte Lichtenstein,* 67 Cal. 329.[1])

The second is the law of Congress, apparently impairing the right of contract, in declaring that no agent, attorney, or other person engaged in preparing, presenting, or prosecuting any claim under the provisions of the Pension Act shall demand, receive, or retain for his services any sum greater than ten dollars, and making a violation of the act a misdemeanor. But the constitutionality of the act is upheld by the supreme court of the United States upon the express ground that no pensioner has a vested legal right to his pension. The pensions are the bounties of the government which Congress has the right to give, withhold, distribute, or recall at its discretion, and, being at liberty so to give or withhold, "may prescribe who shall receive it, and determine all the circumstances and conditions under which any application therefor shall be prosecuted. No man has a legal right to a pension, and no man has a legal right to interfere in the matter of obtaining pensions for himself or others." (*Frisbie* v. *United States,* 157 U. S. 160.)

For the foregoing reasons the provision of the act under consideration is declared void, and the prisoner is discharged from custody.

McFarland, J., Van Dyke, J., Lorigan, J., Angellotti, J., concurred.

---

[1] 56 Am. Rep. 713.

BEATTY, C. J., concurring.—I concur. While no valid distinction can be made between this act and a usury law, it is equally true that no valid distinction could be made between this act and a penal statute limiting the charges of surgeons and physicians, and compelling them to repay all fees collected in case of failure to cure. The impolicy of such a law might be more evident, but in principle it would be no more vicious than other laws limiting the price of commodities, and it could be much more easily vindicated as an exercise of the police power. The sick, the diseased and infirm, constitute a much larger class than the unemployed, and no class is under stronger compulsion to make improvident bargains in the hope of relief. But the preservation of the public health—a prime object of the police power—has not been deemed a justification for a law making it a crime to charge more than a fixed maximum for medical or surgical services. It is also essential to the public health that people should have a sufficient quantity of wholesome food, and there are numerous statutes designed to guard the purity of foodstuffs, but none limiting their price. The law considered in *Holden* v. *Hardy*, 169 U. S. 366,—a law limiting the hours of labor underground,—was properly sustained as a valid exercise of the police power. It is of a piece with the whole course of factory legislation in England, the United States, and other civilized countries during the last century,—legislation by which the condition of all operatives, and especially of children, has been so greatly ameliorated. It is based upon the unquestioned right of the state to prohibit its citizens from engaging, even voluntarily, in occupations destructive or dangerous to health or morals—or when an industry, though dangerous or detrimental, is nevertheless essential to the general welfare, from pursuing it in a manner unnecessarily hazardous or detrimental. Such legislation can never be cited as a precedent or justification for interference with freedom of contract in occupations useful, legitimate, and free from danger to the public health, safety, and morals.

The usury law stands alone as a precedent for this act, but that is an anomaly, and if it could be held to justify the enactment here in question, it would justify special laws fixing the prices of all commodities, and for labor and services of every description and in all vocations.

CXLIV. Cal.—16

SHAW, J., dissenting.—I dissent.  There can be no doubt
that the legislature possesses the power, in cases where the
comfort, health, well-being, or prosperity of the community
demand it, to make reasonable regulation of the right of per-
sons to make such contracts with others as they please.  In
*Holden* v. *Hardy,* 169 U. S. 391, the supreme court of the
United States says: "This right of contract, however, is itself
subject to certain limitations which the state may lawfully
impose in the exercise of its police powers." (*Thorpe* v. *Rut-
land,* 27 Vt. 140;[1] *Dobbins* v. *Los Angeles,* 139 Cal. 183;[2]
*Odd Fellows Cemetery Assn.* v. *San Francisco,* 140 Cal. 235;
*Commonwealth* v. *Alger,* 7 Cush. 104; *Hooper* v. *California,*
155 U. S. 648; Cooley on Constitutional Limitations, pp. 837,
887.)  In *Holden* v. *Hardy,* 169 U. S. 391, the court had un-
der consideration the validity of a law prescribing the num-
ber of hours of labor per day of workmen in underground
mines.  The law was held valid on the ground that it must
be presumed that the legislature believed that labor in under-
ground mines for an excess of eight hours per day would be
detrimental to health.  The police power, however, is not
limited in its application to such laws as may be deemed neces-
sary for the preservation of the general health and comfort.
It embraces also the preservation and promotion of the gen-
eral welfare and prosperity.  In considering the validity of
laws which have no specific relation to health or comfort, but
which are enacted in the exercise of the police power, for the
general welfare of society, many of the same principles are
applicable as in those involving health or comfort.  The people
can usually be trusted to look after the preservation of their
own health in their own way.  But, owing to their necessitous
circumstances, they are sometimes unable to do so properly,
and in such instances the legislature has the power to deter-
mine for them what shall be done for that purpose.  So, also,
people generally may be depended on to make such contracts
as their several interests demand, and under all ordinary con-
ditions the right freely to do this cannot be interfered with
or controlled by the legislative power.  But, under some cir-
cumstances, a class of persons may be so situated with respect
to another class that they are subject to oppression, and
though nominally free and at liberty to do as they please, they

[1] 62 Am. Dec. 625.                    [2] 96 Am. St. Rep. 95.

are in reality compelled to act at the dictation of others whose self-interest leads them to take an undue advantage, and in such cases the legislature may, in the exercise of police powers, declare that certain contracts which, in its judgment, it deems injurious to the general welfare and prosperity of the people, shall not be made, and, if made, shall not be enforceable.  In this connection the observations of the United States supreme court in the case last cited concerning the validity of a law prescribing the hours of labor in certain exceptional occupations are pertinent.  Speaking of the miners and the mine-owners, the court says: "The proprietors of these establishments and their operatives do not stand upon an equality, and their interests are, to a certain extent, conflicting.  The former naturally desire to obtain as much labor as possible from their employees, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce detrimental to their health or strength.  In other words, the proprietors lay down the rules and the laborers are practically constrained to obey them.  In such cases self-interest is often an unsafe guide, and the legislature may interpose its authority."

The right of the legislature to enact laws prescribing the rate of interest, usually denominated usury laws, is essentially a part of the police power.  I think it is a mistake to say that our heritage from the common law in this respect consists solely of the specific right to pass such laws, without regard either to their wisdom or to the conditions which sanction the exercise of the power.  Our heritage is rather the sound principle that, in the performance of its duty to promote the general welfare, a declared object of the constitution of the United States, the legislature may pass such laws as may reasonably be found necessary to protect the helpless and weak from the exactions of the strong.  Originally, indeed, the usury laws were said to be founded upon the notion that it was contrary to the law of God to make a charge for the use of money, which was said to be in itself inert and unfruitful.  But that has long ceased to be considered as the foundation on which they rest.  Eighty years ago Lord Chief Justice Best, in the House of Lords, said: "The supposed policy of usury laws in modern times is to protect necessity against avarice, to fix such a rate of interest as will enable

industry to employ with advantage a borrowed capital, and thereby to promote labor and increase national wealth." (3 Bing. 196.) Chancellor Kent, on the same subject, says: "Civil government is continually placing guards on the weaknesses and checks upon the passions of men; and many cases might be mentioned in which there is, equally with usury laws, an interference of the lawgiver with the natural liberty of mankind to deal as they please with others." (*Dunham* v. *Gould,* 16 Johns. 380.[1]) In *First National Bank* v. *Plankinton,* 27 Wis. 177,[2] the court says that usury laws are "enacted to protect the weak and necessitous from being overreached and oppressed by the powerful and rich." Our state law regarding the rate of interest which may be lawfully charged by pawnbrokers is an instance of the exercise of this power for the object of promoting the general welfare. In *Ex parte Lichtenstein,* 67 Cal. 359,[3] this law was declared constitutional. It was not disputed that the legislature could thus restrict the power to contract, and the principal ground of attack was, that the law was special and not of uniform operation. But the court manifestly considered that it was an exercise of police power, saying: "It is well known that persons frequenting the offices of pawnbrokers are generally the reckless and needy and improvident, who require the protection of the law. To no other class of money lenders do the same reasons apply. Men, driven by the necessities of their situation, resort to the pawnbroker, and pledge any and all articles in their possession in order to raise money, and they are not particular about the rate of interest charged them. . . . Pawnbrokers are not allowed to do a certain act because the legislature, in its wisdom, deemed it injurious and harmful to the community to permit them to do the prohibited act." (*Ex parte Lichtenstein, supra.*)

I can see no real distinction between laws of the character above considered and the one here involved. If one who desires to borrow money, or the miner in an underground mine, the one having property to pledge and the other being already employed, are likely, from their necessities, to submit to unjust exactions by those with whom they deal, how much more likely to do so is the person who is out of employment,

---

[1] 8 Am. Dec. 323.      [3] 56 Am. Rep. 713.

[2] 9 Am. Rep. 453.

who depends on his daily wages or monthly salary for his daily bread, and who sees before him starvation for himself and a dependent family if he does not speedily secure remunerative employment. The number of this class of persons far exceeds the number of those who borrow from the pawnbroker, or those who work underground in the mines. The general welfare and prosperity of the community will be affected in proportion to the numbers of the class which is subject to the oppression and exactions of the more fortunate and prosperous.

It is upon the same principle that authority is found for the power of the legislature to restrict and limit the right of persons to make such contracts as they please in many other respects. Thus, the legislature may provide that oral contracts for the sale or conveyance of real estate, or of personal property above a certain value, or to pay commissions to a real-estate agent for negotiating a sale, shall be void; or that certain classes of contracts for the erection of buildings or other structures, unless put in writing and filed for record, shall be invalid in part, and that certain stipulations in such contracts, although in writing, shall be void as against persons claiming a lien on the premises. All these constitute instances of the exercise of legislative power to interfere with the liberty to make contracts, the reason being that the general welfare will be promoted by such interference.

It is, of course, not to be denied that there are just limitations to the exercise of the power for the protection of the unfortunate and weak. It is not absolutely free from the supervision of the courts. But we cannot hold the law void because we think it may prove ineffectual for the purpose intended, owing to the refusal of those to whom it is directed, or for whose benefit it was designed, to obey its mandates. The validity of a law is to be determined upon the assumption that it will be obeyed. The possibility of its enforcement is a matter solely for the legislature to consider when the law is enacted. Nor can we place our own judgment against that of the legislature in respect to the necessity for the protection which the legislature has seen fit to provide, unless we can clearly see that there can be no such necessity. ''Though reasonable doubts may exist as to the power of the legislature to pass a law, or as to whether a law is calculated or adapted

to promote the health, safety, or comfort of the people, or to secure good order, or promote the general welfare, we must resolve them in favor of that department of the government." (*Holden* v. *Hardy*, 169 U. S. 391.) To quote further from the same case (p. 398) : "The question in each case is whether the legislature has adopted the statute in the exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression or spoliation of a particular class."

With these rules for our guidance, there can be but one answer to the question as to the constitutionality of this law. In the light of history, and even in the face of present conditions, we cannot say that the law was not passed in the exercise of a reasonable discretion, nor that there may not exist a reasonable necessity for the protection of those classes which are peculiarly liable to be thrown out of employment at every check to the current of industrial progress, from the possible rapacious demands of those to whom they are generally compelled to apply for another opportunity to earn subsistence by their toil.

For these reasons I am of the opinion that the law under consideration is valid.