ZALE–LAS VEGAS, INC., A NEVADA CORPORATION; ZALE OR ZALES JEWELRY STORE, IN LAS VEGAS, NEVADA, APPELLANTS, v. BULOVA WATCH COMPANY, INC., RESPONDENT.

No. 4753

November 16, 1964                    396 P.2d 683

*Foley Brothers*, of Las Vegas, for Appellants.

*Sundean, Christensen, Bell, Morris & Albright*, of Las Vegas, for Respondent.

# OPINION

By the Court, BADT, C. J.:

This is an appeal from the judgment of the court below upholding the validity of the Fair Trade Act, being Chapter 48, Stats. of Nevada, 1937, and comprising NRS 599.010–599.050, and granting a preliminary injunction enjoining appellants from advertising, offering for sale, or selling Bulova products at prices below those established by the fair-trade agreement between Bulova and Ginsburg Jewelry Company. We reverse.

The title to the act in question reads as follows: "An Act to protect trade-mark owners, their agents, producers, distributors, and the general public against injurious and uneconomic practices in the distribution of competitive commodities bearing a distinguishing trade mark, brand or name, through the use of voluntary contracts establishing minimum resale prices, and other matters properly relating thereto."

Section 2 of the act reads: "Willfully and knowingly advertising, offering for sale or selling any commodity at less than the minimum price stipulated in any contract entered into pursuant to the provisions of this act, *whether the person so advertising, offering for sale or selling is or is not a party to such contract,* is unfair competition and is actionable at the suit of any person damaged thereby." (Emphasis supplied.)

An annotation in 60 A.L.R.2d 420, entitled "Validity, under state constitutions, of nonsigner provisions of Fair Trade Laws" (1958), discusses under appropriate headings all the jurisdictions to the date of the annotation which showed, at that time, if our count is correct, 15 jurisdictions including the United States Supreme Court, holding in favor of constitutionality, and 13 holding against constitutionality. Subsequent to that

annotation, 12 states have decided the issue—10 against constitutionality and 2 in favor, so that at present 23 jurisdictions have held such acts unconstitutional as against 17 upholding the acts. The issue has not been decided in this jurisdiction and we are therefore free to adopt either theory.

To discuss all the cases, or even to cite or list the same, is beyond the requirements of this appeal. We restrict ourselves, then, to reciting the rationale of the leading cases upholding the Fair Trade Acts and the rationale of the cases striking them down, and to our choice of the latter.

The writer of the annotation, at 60 A.L.R.2d 422, describes the issue in the following words:

"Fair trade laws, although of comparatively recent origin, are unquestionably the most familiar of legislative methods to control resale prices. Such statutes validate contractual provisions by which the buyer of a trademarked or 'brand name' commodity agrees that he will not resell the commodity except at the price stipulated * * *. Included in such statutes are so-called 'non-signer provisions'—often described as the backbone of fair trade legislation—under the terms of which one not a party to such a contract, who, with notice, offers for sale or sells a commodity at less than the resale price stipulated in a contract between the vendor and a buyer of a trademarked commodity, is made subject to liability for unfair competition; * * *. The validity of these provisions as a matter of federal constitutional law having been established by a decision of the United States Supreme Court, the question to be dealt with herein is whether non-signer provisions are defective from a state constitutional point of view."

The provisions of the Nevada constitution involved are the following sections quoted in pertinent part:

Art. 1, §1: "All men * * * have certain inalienable rights among which are those * * * Acquiring, Possessing and Protecting property * * *."

Art. 1, §8: "* * * No person shall * * * be deprived of life, liberty, or property without due process of law; * * *."

Art. 1, §20: "This enumeration of rights shall not be construed to impair or deny others retained by the people."

Art. 4, §1: "The Legislative authority of this State shall be vested in a Senate and Assembly which shall be designated 'The Legislature of the State of Nevada' * * *."

Appellants contend that under these provisions and under Article 4, §17, the act violates the constitution, because (1) it is in violation of the requirement: "Each law enacted by the legislature shall embrace but one subject, and matter, properly connected therewith, which subject shall be briefly expressed in the title * * *;" in that the title to the act recites that it is "An Act to protect trade-mark owners, their agents, producers, distributors, and the general public against injurious and uneconomic practices in the distribution of competitive commodities bearing a distinguishing trade mark, brand or name, through the use of voluntary contracts establishing minimum resale prices * * *," thus referring only to voluntary contracts, while effective against contracts not signed by the vendees of the trade-mark commodities. Although this issue is argued at great length in the briefs, we find it unnecessary to dispose of it by reason of our other reasons for holding the act in violation of the constitution.

Appellants attack the legislation upon the further grounds as follows:

"2.   It is unlawful exercise by the Legislature of the police power granted to the state.

"3.   The Act constitutes an unlawful deprivation of property rights of Appellant contrary to the due process clause of the Nevada Constitution.

"4.   The Act is an unlawful delegation of Legislative authority contrary to the Nevada Constitution."

So heavily does the respondent rely on Max Factor & Co. v. Kunsman, 5 Cal.2d 446, 55 P.2d 177, that its quotations from the opinion consume 15 pages of its typewritten brief. Many pages of the quoted matter are devoted to the proposition that the advisability of the legislation, or whether it is good or bad, is no concern

of the court. This point has been so often determined by this court that no great citation of authorities or quotation of page after page of the decisions is or was necessary. The California court did definitely hold, however, as concisely noted in headnote 9: "Power of state to regulate right of free bargaining in exercise of police power includes power to regulate price"; and, as concisely stated in headnote 10: *"Price fixing* in statute affecting entire class of articles which is reasonably subject of classification is valid, *notwithstanding that articles involved may not be affected with public interest";* and further, as concisely, stated in headnote 11: "Purchase and sale of article or entire class of articles *is affected with public interest where subject to regulation under police power."* (Emphasis supplied.)

This statement (headnote 11) holds itself up by its own bootstraps. The main question as will hereafter appear is whether the regulation was a proper exercise of the police power. The mere fact that an article was subject to regulation under the police power cannot, of itself, indicate that it is affected with a public interest.

Having then seen that "price fixing" and "regulating price" are recognized as being the purpose of the act, it then appears, as indicated briefly in headnote 12, that the provisions in question of the Fair Trade Act were "intended to protect property and contract rights *of manufacturer or producer* of commodities by prevention of price cutting, and not primarily as price-fixing statute * * *." (Emphasis added.)

The court then proceeded to hold that such acts were not arbitrary or discriminatory and were not an unconstitutional denial of the equal protection of the laws. The court held further that, in approving injunctions issued under such statutes with reference to the sale of trade-marked commodities at prices less than those fixed by the producer in contracts with other distributers or other retailers (although the particular defendant was not a party thereto), the relief was limited to the factual situation presented to the court.

In the case under discussion, Factor was engaged in

the manufacture of cosmetics and toilet articles manufactured by it under registered trade-marks, and had transferred to Sales Builders, Inc., the exclusive right and privileges of selling such commodities in the United States, "including the state of California" with the good will pertaining thereto and with the right to use the trade-marks; that Kunsman offered such commodities "at prices conspicuously lower than the marked or established prices of said commodities as so-called 'leaders,' * * *"; that persons or traders such as Kunsman have become known as "cut-rate drugstores." The "evils" of such system were recited in the opinion. Other dealers were forced to meet the cut prices, trade-marks and brand items were offered at prices cut to a point yielding no profit and in many cases representing a loss. Other distributors in general observe and conform with the terms of the contracts. Sales Builders, Inc., enjoys a good profitable business under the California Fair Trade Act, but the practices of the defendant have caused other distributers to sell such products at conspicuously lower prices, so that other dealers are forced to meet defendant's price competition. The defendant "has procured, and continues to procure, commodities manufactured by Max Factor & Co. bearing the trade-marks, brands, and names of Max Factor & Co., and has sold, and is now selling, the commodities at prices less than the retail sales prices which are being sustained by substantially all of the retail dealers in cosmetics and toilet articles in the state of California." Such practices "are unduly influencing retail and wholesale distributers of Max Factor & Co.'s products * * *," and that other retailers will have to meet such prices, that the result "will be the destruction of the business of plaintiffs and the good will pertaining thereto."

The foregoing quotations are for the most part the statements by the California court of the allegations of the plaintiffs' complaint. The trial court sustained a demurrer to the complaint. The Supreme Court of California reversed, rejecting "respondent's main contention that such a statute violates the due process and equal protection clauses of the Federal and State Constitutions, in that it denies to him the liberty and freedom

of contract." The court first discussed the theory of the California Cartwright Act, illustrating the theory then adopted that "at the time such statutes were passed [the legislature was], of the view that, from a social standpoint, free and open competition was desirable. The basis of this view is that, in the long run, it is against public interest to allow the manufacturer, producer, or distributer to fix the resale price of an article. In recent years, there has developed, in opposition to the above views, the concept that a manufacturer of a trade-marked article that is sold in competition with articles of a similar nature and who has fixed a fair price at which he, as well as his distributer and retailer, can make a fair profit, has a property right in the good will towards his product which he has created, and that it is sound public policy to protect that property right against destruction * * *. The basic theory on which this concept rests is that, from a social standpoint, price cutting, in the long run, adversely affects the public interest * * *. [T]he state Legislature * * * adopted in 1907, partially at least, the first economic policy above discussed. By the enactment of the Fair Trade Act in 1931 * * * the state Legislature, for reasons known to it and which we must presume were sufficient, has seen fit to attempt to change its former policy and to adopt the second economic concept above discussed." The California court then goes on to discuss at length the proposition that it has no duty to determine whether the statute is wise or unwise, but only to determine whether the subject of the legislation is within the state's power, "and, if so, to determine whether the means adopted to accomplish the result are reasonably designed for that purpose, and have a real and substantial relation to the objects sought to be attained." The California court then quotes at length from Nebbia v. New York, 291 U.S. 502, at 537, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469, which upholds the right of a state "to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose." It emphasized safeguard of the consumers' interests, waste harmful to the public, the threatened cutting off the

supply of a commodity needed by the public, the destruction of the industry itself. It sustained "price control" if not arbitrary, discriminatory or demonstrably irrelevant and an unnecessary and unwarranted interference with individual liberty. The United States Supreme Court went on to say: "In the second place, it must be kept in mind that the present statute is one passed in the exercise of the *state's* police power, and so differs fundamentally from statutes passed by the federal government." The court went on to concede that "* * * when the Legislature attempts to regulate the price of a particular commodity, in order to justify classifying that article differently from other commodities, its purchase and sale must affect the public interest."

Thompson, J., and Shenk, J., dissented. We discuss these dissents because they support what we recognize as the majority rule and as the modern trend. (Mr. Justice Shenk first concurred in the dissent of Mr. Justice Thompson and then wrote an additional dissenting opinion of his own.) The dissent asserted that no answer could be found to the contention that the act violated section 1 of Article 1 of the California constitution: " 'All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property; and pursuing and obtaining safety and happiness' "; and section 13 of the same article that no person "shall 'be deprived of life, liberty or property without due process of law.' " The dissent quotes Ex parte Quarg, 149 Cal. 79, 84 P. 766, 5 L.R.A., N.S., 183, 117 Am.St.Rep. 115, 9 Ann.Cas. 747, as follows:

" 'The constitutional guaranty securing to every person the right of "acquiring, possessing and protecting property," refers to the right to acquire and possess the absolute and unqualified title to every species of property recognized by law, with all the rights incidental thereto, and, in connection with the right of personal liberty, *it includes the right to dispose of such property* in such innocent manner as he pleases, and *to sell it for such price as he can obtain in fair barter.'* " (Italics added.) To the same practical effect is Ex parte Dickey,

144 Cal. 234, 77 P. 924, 925, 66 L.R.A. 928, 103 Am.St. Rep. 82, 1 Ann.Cas. 428, in which we find this expression:

" 'This right of contract common to all legitimate occupations is an asset of the petitioner in his chosen occupation, and, as has been said, is a part of the property in the enjoyment of which he is guarantied protection by the Constitution. By the act in question he is arbitrarily stripped of this right of contract, and deprived of his property, and left, in following his vocation and in pursuit of his livelihood, circumscribed and hampered by a law not applicable to his fellow men in other occupations.' "

The dissent goes on to say:

"Second I refer to Doubleday, Doran & Co., Inc. v. R. H. Macy & Co., Inc., 269 N.Y. 272, 199 N.E. 409, 411, which case involved a practically verbatim copy of the section here involved, adopted by the Legislature of New York. Bearing in mind that the New York Court of Appeals was the same court which first sustained the New York Milk Control Act (People v. Nebbia, 262 N.Y. 259, 186 N.E. 694), which was the subject of judicial inquiry in the case of Nebbia v. New York, from which the majority opinion has quoted so extensively, the expressions we find in the case are especially illuminating. It is there said:

" 'That the states cannot fix the selling price of any and all commodities has been settled. Williams v. Standard Oil Co., 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287, 60 A.L.R. 596; Tyson & Bro. United Theatre Ticket Offices v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718, 58 A.L.R. 1236; Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280; Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A. 1917E, 1196, Ann.Cas. 1918A, 955.

" 'Books, at least these books, are not "affected with the public interest" any more than theater tickets; no emergency has yet arisen in literary publications, and the business is not such as comes within the class which must submit to rate fixing. Circumstances which cannot be foreseen from one generation to another may arise

which will require certain articles to submit to regulatory prices in order that the public may get them at all or get them in a pure and beneficial state. We cannot always express legislative power in exact formulas nor decide a case before it happens. Experience is the mother of teachers. Under the Nebbia Case for instance (Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469), no one would doubt now that New York state would have the power to get milk to the public somehow if any combination of forces threatened to shut off all supply or to deteriorate that which was supplied.[1] The price might be an element to be considered with other things in such a case. So we thought in People v. Nebbia, 262 N.Y. 259, 186 N.E. 694. But to fix arbitrarily the price of books by legislation and not by agreement comes within the condemnation of the decisions which have heretofore dealt with like legislation. What the Legislature cannot do directly it cannot do indirectly, nor does it cease to be a price fixed by the Legislature because that body has clothed the publisher with the power or authority to establish it.' "

The dissent further refers to several opinions by the United States Supreme Court dealing with the question of whether a business is "affected with a public interest" so as to make it subject to regulatory measures. These are specifically defined, and the following is then quoted, with italics by the California court, from Wolff Packing

[1] But how different are the facts in the present case—not the distribution of milk, in which the public is definitely involved, but the distribution of Bulova watches. Respondent introduced in evidence the price list of all Bulova watches which was enclosed with the letter referring to the Bulova fair-trade agreement "in effect in your state," and advising all persons selling watches and jewelry, *"although you are not a signatory to these agreements,* you are obliged to advertise and sell Bulova fair-trade products at no less than Bulova's stipulated minimum resale prices." The price list ranged from $24.75 to "to the Accutron (platinum) $2,500." "The Beau Brummel 'WW' " is listed at $400. It was stated in oral argument and not denied that the very high prices listed for some of the wrist watches resulted from the decorations of diamonds and other jewels in the wristband. It is difficult to conclude that in such cases the fixing of a minimum price was a protection of the manufacturer's trade-mark or that it was a commodity affected with a public use or in which the public was interested.

Co. v. Court of Industrial Relations, 262 U.S. 522, 535, 43 S.Ct. 630, 632, 67 L.Ed. 1103, 27 A.L.R. 1280:

" 'In nearly all the businesses included under the third head above, the thing which gave the public interest *was the indispensable nature of the service and the exorbitant charges and arbitrary control to which the public might be subjected without regulation.*' "

There follows this language:

"It is said that whether these results should follow is an economic problem with which the courts have nothing to do. But it is the business of the courts to see to it that, in carrying out any such program, the fundamental and guaranteed rights of the citizen to deal with his property as he chooses, subject to such reasonable regulations as may properly be imposed, are not destroyed. The statute under attack does not regulate. It prohibits. It is essentially a price-fixing statute. To me it is beyond question that the Legislature itself could not fix the retail prices of all or any commodities not affected with a public interest or clothed with a public use. We are bound by the decisions of the Supreme Court of the United States on that subject, as pointed out in the opinion of Mr. Justice Thompson. If the Legislature itself is without power to fix the retail price of such commodities, how then can it delegate that power to one who is governed by no power except his own self interest?"

Nebbia v. New York, supra, involved the price fixing of milk. The majority upheld the statute. But even with a commodity of that nature, four justices dissented.

Strong reliance is placed upon Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U.S. 183, 81 L.Ed. 109, 106 A.L.R. 1476, in which the Supreme Court of the United States upheld the Chicago Fair Trades Act whose primary aim "is to protect the property—namely, the good will—of the producer, which he still owns. The price restriction is adopted as an appropriate means to that perfectly legitimate end, and not as an end in itself.

\* \* \* \* \*

"Appellants own the commodity; they do not own the mark or the good will that the mark symbolizes. And

good will is property in a very real sense, injury to which, like injury to any other species of property is a proper subject for legislation."

In concluding, the court said:

"* * * [S]ince the sole purpose of the present law is to afford a legitimate remedy for an injury to the good will which results from the use of trade-marks, brands or names, it is obvious that its provisions would be wholly inapplicable to goods which are unmarked."

Thus the sole ground for upholding the validity of the Chicago Fair Trade Act was to protect the trade-mark or brand of the producer.

Many cases uphold the validity of fair trade laws and reject the attacks made on such laws, whether the attack is based upon the claim that the particular statute is an unlawful exercise of the police power or that it violates due process or that the non-signer clause is an unlawful delegation of legislative authority.

Of the cases that strike down such statutes, some do it upon a single one of the grounds last mentioned, or upon two of such grounds, or upon all such grounds. The grounds that the statute deprives a non-signer of his property without due process and also that it is an unlawful exercise of the police power overlap. If the commodity in question is affected with a public use or its regulation is required for the public health or welfare, then the police power may be used to regulate its sale even though its result is to interfere with the disposition of his own property lawfully acquired.

With special regard to the closing paragraph of the Old Dearborn case quoted, supra, upholding the legislation as a protection of the manufacturer's ownership of his trade-mark or good will, we quote from an article by Professor Harry Shulman of Yale Law School: "The Fair Trade Acts and the Law of Restrictive Agreements Affecting Chattels," in 49 Yale Law Journal 607, 616:

"It is common knowledge that the pressure for the passage of these Acts, insofar as it was publicly disclosed, came not from manufacturers or other trademark owners but from distributors—first and foremost the retail druggists associations and then other retail

and wholesale distributors. It is doubtless true that many distributors wanted resale price maintenance at the time of the Dr. Miles case. And doubtless true also that some manufacturers want resale price maintenance now for the reasons stated by the Supreme Court, Professor Chafee and Mr. Rogers. But the organized pressure for the Fair Trade Acts, however subsidized privately, came from distributor groups; and the legislative response was response to distributor groups. Distributors organized in Code Authorities under the NRA sought to deal with the problems of loss leaders, price cutting and so-called predatory or cut-throat price competition. Upon the demise of the NRA, they turned to the Fair Trade Acts as a partial substitute. The concern of the distributors was not for the goodwill symbolized by the trade-mark, but for their own welfare. They sought an adequate mark-up, and adequate profit on the goods which they marketed,—not protection of the manufacturer's trade expectancies. They sought to protect themselves against old and new methods of merchandising which threatened their positions whether or not the producer or his goodwill were similarly threatened. If the producer were also to profit from the scheme, that was an accidental incident."

In an article written some 14 years later by Professor Carl H. Fulda, of Rutgers University, 21 University of Chicago Law Review 175, the author says: "The 'good will' theory of the Old Dearborn decision thus seems to be at odds with both the realities of the market place and the theories of the law of unfair competition." He goes on further to say: "* * * [T]he second Schwegmann case [in which Schwegmann reduced his profit to 15% instead of the minimum 40% fixed by the producer] is Exhibit A for the proposition * * * that the fair-trade laws make no distinction between competitive and predatory price cutting." The author continues: "On the basis of these considerations the Supreme Court of Florida held recently that the fair-trade law of that state is 'arbitrary and unreasonable and violates the right to own and enjoy property' guaranteed by the Florida Constitution, and that it 'serves

a private rather than a public purpose.' " Liquor Store, Inc. v. Continental Distilling Corp., 40 So.2d 371, 375 (Fla. 1949).

Similarly the Supreme Court of Michigan in Shakespeare Co. v. Lippman's Tool Shop Sporting Goods Co., 334 Mich. 109, 54 N.W.2d 268, held the non-signer clause unconstitutional as violative of the due process clause of the state constitution. It rejected the argument that the non-signer clause was a valid exercise of the state's police power because it is directed against "destructive price cutting." The court said: "Can it be said that by the process of reducing prices either war, destruction or evil are visited upon the public health, safety, morals or the general welfare? (That is the controlling question.) Such is not the concept upon which America's competitive economy was developed."

Likewise the Supreme Court of Georgia in Grayson-Robinson Stores, Inc. v. Oneida, Limited, 209 Ga. 613, 75 S.E.2d 161, held a non-signer act to be "null and void" because it offends the due process clause of the Georgia constitution.

In Union Carbide & Carbon Corp. v. White River Distributors, 224 Ark. 558, 275 S.W.2d 455, the Supreme Court of Arkansas struck down the Fair Trade Act, as it was not protective of the public welfare, and was in violation of the due process clause of the state constitution:

"* * * It is a generalization, but not an overstatement, to say that the effort to 'fix prices' is made by groups who desire to sell something for more than the sponsoring group believes that the purchasing public would pay for that 'something' without an enforced fixed price. It would seem apparent that the principal objective of minimum price maintenance is the protection of profit margins for retailers and distributors unable or unwilling to meet the pressure of competition."

Consider also the following reasoning of the Arkansas case:

"* * * Considering the Act in relation to this particular case, it virtually gives appellant the absolute right to fix the price at which Prestone must be sold to the

consuming public in Arkansas without regard to the cost of manufacture or distribution. We are not forgetting that it must first contract with one retailer in the state and appellee must have knowledge of contract and the fixed price, but these provisions consist more of form than substance and merely indicate a desperate attempt to hedge against the charge of unconstitutionality. Nobody doubts the feasibility of appellant acquiring one contract dealer out of the hundreds of retail dealers in the state, or the feasibility of bringing this information to all other dealers. If securing a contract with one dealer binds all others, then the corollary would be that, absent such contract, the others are not bound. It is frightful to think a device so easily concocted could destroy the constitutional bulwark protecting our personal liberties and the public welfare."[2]

In Olin Mathieson Chemical Corp. v. Francis, 134 Colo. 160, 301 P.2d 139, 147, the Colorado court sitting en banc declared the act unconstitutional on several grounds. With respect to the exercise of the police power, the court said:

"* * * The right to contract is a property right, protected by the due-process clause of the constitution, Const. art. 2, §25, and cannot be abridged by legislative enactment. The police power of the state exercisable by the General Assembly, while very broad, is exercisable only within the limits of the constitution. To sustain the price-fixing power attempted by the General Assembly in the statute involved, under a claimed exercise of the police power, would be to place the power of the legislature above the constitution."

In General Electric Company v. A. Dandy Appliance Co., 143 W.Va. 491, 103 S.E.2d 310, the West Virginia court said:

---

[2] Even the ancient poets expressed their horror in considering the holding of the dogmatic theologians:

> "What! from his helpless Creature be repaid
> Pure Gold for what he lent him dross-allay'd—
> Sue for a Debt he never did contract,
> And cannot answer—Oh the sorry trade!"

Omar Khayyam, The Rubaiyat, Quatrain LXXIX

"* * * However, our conclusion that the Act in question is not a proper exercise of the police power of this state will eliminate any necessity for holding the Act valid because it may not violate the Federal Constitution. We are of the opinion that the determination of the extent and limitations of the police power of this state remains a prerogative of the sovereignty of this state and any question of constitutionality thereof under the Constitution of West Virginia is determinable by this Court.

\* \* \* \* \*

"Though it is of great advantage to the plaintiff to have additional protection in the provision making it unlawful to sell trademark or brand articles below the prices fixed by the manufacturer, nevertheless the manufacturer or distributor is not deprived of his rights to make reasonable contracts with others in regard to the price at which such merchandise shall be sold, and he can protect himself by suits for enforcement or damages. To extend such manufacturer's or distributor's rights to the public generally is but another improper exercise of the police power and not in our opinion warranted, and being such is void, as in violation of [the West Virginia due process clause]."

The Supreme Court of Washington in Sears v. Western Thrift Stores of Olympia, 10 Wash.2d 372, 116 P.2d 756, had in 1941 upheld the constitutionality of the nonsigner provision, with three judges dissenting. However, it re-examined that decision in Remington Arms Company v. Skaggs, 55 Wash.2d 1, 345 P.2d 1085, in 1959, and quoted with approval 16 C.J.S. Constitutional Law §195, pp. 939–945, as follows:

" '* * * the limit of a state's exercise of the [police] power is reached when the regulation transcends public necessity.

\* \* \* \* \*

" 'In order that a statute may be sustained as an exercise of the police power, * * * the courts must be able to see that the enactment has for its object the prevention of some offense or manifest evil or the preservation

of the public health, safety, morals, or general welfare, that there is some clear, real, and substantial connection between the assumed purpose of the enactment and the actual provisions thereof, and that the latter do in some plain, appreciable, and appropriate manner tend toward the accomplishment of the object for which the power is exercised.

" '* * * The legislature may not exercise the police power for private purposes, or for the exclusive benefit of particular individuals or classes. * * *

" 'A statutory provision which is not a legitimate police regulation cannot be made such by being placed in the same act with a police regulation, or by being enacted with a legislative declaration of a purpose which would be a proper object for the exercise of that power. * * *' "

The court then said:

"Thus, it is seen that to justify any law upon the theory that it constitutes a reasonable and proper exercise of police power, it must be reasonably necessary in the interest of the health, safety, morals, or welfare of the people. This exercise of police power must pass the judicial test of reasonableness.

\* \* \* \* \*

"Since May, 1951, sixteen state supreme courts have declared acts of this kind unconstitutional. Generally, the acts were found unconstitutional on the grounds that legislative power had been unlawfully delegated and that they constituted improper use of the police power in that they bore no reasonable relation to the health, safety, morals, or general welfare of the public."

As did the Supreme Court of Washington in reversing its position as to the constitutionality of the statute, so did the Supreme Court of Pennsylvania overrule its 1955 decision in the case of Burche Co. v. General Electric Co., 382 Pa. 370, 115 A.2d 361, upholding Pennsylvania's Fair Trade Act in the March, 1964, decision in Olin Mathieson Chem. Corp. v. White Cross Stores, Inc., 414 Pa. 95, 199 A.2d 266 (rehearing denied in April, 1964). Burche had relied largely on Old Dearborn Distributing

Co. v. Seagram-Distillers Corp., supra, holding, inter alia, that the Pennsylvania statute was not an unlawful delegation of legislative power. In Olin Mathieson the court said: "With this, we do not agree." The basis of Olin Mathieson was unlawful delegation of legislative authority. There was one dissent by the chief justice on the ground that the doctrine of stare decisis should prevail. Jones, J., in a dissent of eight lines, thought that the rationale of Burche was sound and should control.

It was strongly urged in the written briefs and oral argument that the fair-price laws are but a determination of policy and that therefore the court is not in position to interfere with the determination of the legislature. The best answer to that is to quote from the opinion of Harnsberger, J., in Bulova Watch Co. v. Zale Jewelry Co. of Cheyenne, 371 P.2d 409 (Wyo. 1962), in which that court literally kept an accurate score of the 17 states which had held the acts constitutional and the 20 states holding them unconstitutional, with a list of the states in which the fair-trade laws had not yet been attacked and the states that were without fair-trade laws. This was in May, 1962. Mr. Justice Harnsberger said:

"The disposition of the judicial branch of government has always been to scrupulously refrain from encroaching in the slightest way into the legislative field of policy making where factual or economic factors require latitude of discretion. We will not and we do not substitute our opinions in such matters for the considered judgment of our lawmakers. Yet, we ourselves have a function to perform, a constitutional right, and the paramount duty to insist that the legislature not renounce its legislative power by any such attempt to delegate it away. We approached the limit of judicial tolerance in upholding legislative fiat in the so-called trading stamp matter, Steffey v. City of Casper, Wyo., 357 P.2d 456 (1960), rehearing 358 P.2d 951 (1961). We conceded the legislative right to directly prohibit a sales practice which that body evidently deemed was inimical to public welfare. What we cannot approve of here is the attempt to delegate to others the legislative right to prohibit.

"Aside from the improper delegation of legislative power are the further questions of the reasonableness of the law and whether it is an unwarranted invasion of the rights guaranteed by our Constitution. We have heretofore acknowledged that, notwithstanding, property rights and the right to make contracts should be free from governmental interference, still these rights are not absolute. This, of course, means the sovereign may, in proper circumstance, limit the exercise of these rights. When, however, governmental limitation is attempted by giving unto private interests the right to prescribe conditions of use, sale and contract respecting a person's property, such legislation is so grossly unconscionable that courts, as the final arbiters of its reasonableness, must hold the law an unwarranted invasion of the private liberty and property guaranteed by the Constitution of this State.

"The police power of the legislature is great indeed. Its exercise in the protection and preservation of the public safety, its health, its morals, and in behalf of its general welfare is not merely laudable, it is essential. But however great its power, it is nonetheless not beyond limitation. Even if it be agreed that the philosophy behind the enactment of this law brings it within the long-range welfare of the public by assisting in the preservation of certain businesses which can no longer continue to exist without governmental subsidy and the supposed protection accorded by the Act, still the means adopted to accomplish the purpose must provide a legal process by which to infringe the liberty or the property of persons affected. What day in court is given them? To what authority, board, officer, tribunal or court may such persons make representations in their own interest or behalf before the sale price is fixed? It would be bad enough if such a price-fixing formula were accomplished through some public official acting without hearings, but the price-fixing method prescribed by the Act is without even that vestige of due process."

The foregoing case and many of the cases cited therein are authority for the conclusion that our only

concern is whether the act in question offends the provisions of our own state constitution. We are under no compulsion to follow decisions of the United States Supreme Court which considers such acts in connection with the federal constitution. It must be remembered that we are considering an act which is claimed to have been enacted in the exercise of the state police power.

To discuss the opinions in the 20 states that have rejected the Fair Trade Acts would draw this opinion out to unpardonable lengths. Some of them have declared the acts unconstitutional in even stronger language, but we think the rationale of these cases has been sufficiently recited. It is important to note too that such is the holding of most of the recent cases, so that there is a decided trend to hold such non-signer acts unconstitutional. We are impelled to accept the rationale of such cases and reject the reasoning of the cases which declare the acts to be a lawful and reasonable exercise of the police power.

Judgment reversed.

McNAMEE and THOMPSON, JJ., concur.